In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1179

JOHN LAWSON, SR.,

Plaintiff-Appellant,

v.

CSX TRANSPORTATION, INCORPORATED,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 98 C 1182--Sarah Evans Barker, Judge.

Argued September 14, 2000--Decided March 26, 2001

Before CUDAHY, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.  John Lawson, Sr. filed a claim against CSX Transportation, Inc. ("CSX") under the Americans With Disabilities Act ("ADA" or "the Act"). He alleged that CSX had discriminated against him because of a disability when it refused to hire him as a trainee for a train conductor position. The district court held that Mr. Lawson had presented insufficient evidence for a jury to find that his Type I insulin-dependent diabetes constituted a disability within ADA coverage, or that CSX refused to hire him because of his disability. Because we believe that the district court did not analyze properly whether Mr. Lawson is entitled to the protections of the Act and therefore failed to assess properly the evidence of record, we must reverse the judgment of the district court and remand the case for proceedings consistent with this opinion.

I
BACKGROUND
A.  Facts

John Lawson, Sr. has had Type I insulin-dependent diabetes from infancy. According to the affidavit of his physician,/1 in order to manage his disease, Mr. Lawson must monitor carefully blood sugar levels and minimize fluctuations in his blood sugar. This monitoring requires

"continued vigilance" and strict adherence to "a perpetual, multi-faceted and demanding treatment regime." R.58, Ex.1 at 4 para. 11. He must "inject insulin, follow a diet plan, exercise daily, and test his blood sugar several times a day." Id. para. 12. More precisely, Mr. Lawson typically tests his blood four to six times every day and administers three insulin injections. If a blood test indicates a drop in glucose levels, the district court explained that Mr. Lawson "must stop all other activities in which [he] may be engaged at the time and take in the kinds of food that will bring [his] sugar levels back to normal." R.60 at 8. Unless Mr. Lawson acts quickly to raise his blood sugar, "he will experience disabling episodes of dizziness, weakness, loss of mentation and concentration, and a deterioration of bodily functions." R.58, Ex.1 at 4 para. 14. Consequently, "Lawson cannot simply eat when and where he wants to, or exert himself without concern for the effect the exertion will have on his glucose levels." Id. para. 15. Unlike a person with normal metabolic function, Mr. Lawson "must always concern himself with the availability of food, the timing of when he eats, and the type and quantity of food he eats." Id. at 5 para. 15. According to Dr. Skierczynski, "Lawson's eating as a fundamental, major life activity is substantially limited" due to his diabetes. Id.

Throughout his life, Mr. Lawson has had great difficulty regulating his blood sugar levels. As a young person, he was "in and out of hospitals quite a bit" and had frequent insulin reactions that caused him to drop items, get "the shakes, headaches," and "occasionally . . . pass out." R.41, Ex.3 at 32. Despite the fact that Mr. Lawson has not sought hospitalization for his diabetes since 1983, he continues to experience "wildly fluctuating glucose levels with hyperglycemia and hypoglycemia" and had a "severe hypoglycemic reaction" in December 1995, when he became confused and briefly lost consciousness.[2] R.58, Ex.1 at 2 para. 6(e)-(f). Mr. Lawson's symptoms of low blood sugar, or hypoglycemia, include "slur[red] speech, profuse sweating, paleness, shaking, unsteady walk, and fruity odor breath." R.41, Ex.2 at 4 para. 25. Dr. Skierczynski concluded that "Lawson's inability to properly regulate his blood sugar levels will always put his life at risk no matter how vigilantly he monitors his condition." R.58, Ex.1 at 4 para. 13.

Mr. Lawson's diabetes also has precipitated a number of other serious ailments that limit him physically and complicate his treatment and prognosis regarding his diabetic condition.[3] In 1995 and 1996, Mr. Lawson required multiple laser

treatments in each eye for proliferative diabetic retinopathy, a condition that affects the small blood vessels in the retina. He also sought medical advice in 1995 "for fading erectile ability, a problem commonly associated with diabetes," and "continues to suffer from impotence." Id. para. 6(i). Mr. Lawson periodically experiences symptoms of "limited joint mobility syndrome," a condition also associated with diabetes, which causes "swelling in [his] hands and wrists, and pain in [his] elbows, hips and feet." R.41, Ex.2 at 1 para. 4. Additionally, Mr. Lawson suffers from chronic "elevated A-1 C hemoglobin tests" and proteinuria, a condition involving an excess of protein in one's urine that "will likely progress over the years to renal failure." R.58, Ex.1 at 3 para. 6(k)-(l). Dr. Skierczynski predicts that, due to Mr. Lawson's fluctuating glucose levels and high hemoglobin test results, Mr. Lawson "has a high risk of aggravating his already existing medical problems and developing long term complications of retinopathy, nephropathy, neuropathy and cardiopathy." Id. at 5 para. 16.

Mr. Lawson, since graduating from high school in 1984, has held a few jobs of relatively short duration. From 1984 through 1986, Mr. Lawson worked for a time in his parents' kennel business and also performed "a variety of 'odds and ends' work while looking for a permanent job." R.41, Ex.2 at 1 para. 6. Between 1985 and 1986, Mr. Lawson claims that he was employed with a small construction company but that he was forced to leave this job after a serious insulin reaction rendered him unable to work./4 In the period between 1986 through 1998, Mr. Lawson received Social Security Disability Insurance ("SSDI") benefits and worked briefly during two separate periods in temporary jobs, neither of which lasted more than four months.

In March 1997, Social Security personnel noted that Mr. Lawson's medical condition seemed to be improving and suggested to his caseworker at the Indiana Vocational Rehabilitation Agency that Mr. Lawson might be physically able to find steady employment. Mr. Lawson indicated an interest in a conductor trainee program ("the program") offered at Cincinnati State Technical and Community College ("Cincinnati State") to train conductors for CSX, a railroad transportation company based in Jacksonville, Florida./5 In response to an inquiry from Mr. Lawson's caseworker regarding whether a diabetic could perform the conductor's job, Cincinnati State furnished a job description prepared by Laurie Ryan, a resource manager at CSX. The job description for the conductor trainee position lists four requirements:

[(1)] 1 or more years as a freight conductor . .
. or [g]raduation from the 5 week conductor
training program at . . . Cincinnati State . . .
[(2)] [h]igh school diploma or GED [3] [g]ood
physical condition, including vision, color
vision, hearing, and the ability to lift 85
pounds [and (4)] 10th grade reading level[.]

R.41, Ex.6 at 3.


        After undergoing a physical examination by his
family physician, who pronounced him "in good
general condition" and able to "do[ ] this [CSX
conductor] job on a full time basis," R.41, Ex.6
at 4, Mr. Lawson also passed two written entrance
exams required for admission into the program--a
personality test and a mechanical aptitude test.
As a result, on December 23, 1997, Mr. Lawson was
admitted to the program at Cincinnati State.

        Mr. Lawson began the five-week training program
on January 20, 1998, in a class of 14 students.
Mr. Lawson's classmates and instructors in the
program were well aware of his diabetic
condition. At times during the program, Mr.
Lawson explained to them the symptoms of his
condition and the methods by which it can be
treated; at times Mr. Lawson even injected
himself with insulin in class. Ultimately, Mr.
Lawson completed the program with a running quiz
average of 96.1% and an exam average of 94.5%,
well above the 85% minimum average that CSX
requires for consideration as a conductor
trainee.

        In February 1998, Mr. Lawson was interviewed by
Ryan and by Jeanie Layne, who is also a human
resource manager for CSX./6 There is a dispute
regarding what Mr. Lawson told Ryan and Layne at
the interview regarding his diabetes. Mr. Lawson
claims that he explained that his "lack of
employment experience was the result of [his]
diabetic condition," that he "had been totally
disabled for a number of years," and that he "was
receiving social security disability benefits."
Id., Ex.2 at 3 para.para. 16-17. Mr. Lawson also
claims that he described to Ryan and Layne his
efforts to educate his classmates in the program
regarding the symptoms and treatment of
hypoglycemia./7

        Despite the fact that it hires approximately 98%
of all successful program participants, and that
it offered each of Mr. Lawson's classmates
employment, CSX did not offer Mr. Lawson the job.
Ryan testified that Mr. Lawson was not offered
employment because of his very limited work
history, which "was not solid or verifiable."
Id., Ex.1 at 42. Although Ryan maintained that

CSX prefers to hire candidates with a high school diploma and a solid, verifiable work history, she conceded that CSX sometimes makes "exception[s]" and hires conductor trainees who do not have such qualifications. Id. at 70./8 She also acknowledged that CSX had no written standards for evaluating applicants at the time of Mr. Lawson's interview and that this situation gave her a certain level of discretion in making job offers. She explained that, in her view, Mr. Lawson had not provided any additional information that would have justified making an "exception" to CSX's preference for a solid, verifiable work history.

Not long after learning of CSX's decision, Mr. Lawson spoke with Ryan by telephone. In that conversation, as the district court recounted, Ryan told Mr. Lawson that his lack of a solid, verifiable work history was the reason for CSX's decision and that "if Lawson wanted to go flip hamburgers for a year, CSX would reconsider his application." R.60 at 16 (alteration in original) (citation omitted). However, Ryan later admitted that at the time of its employment decision, CSX had in fact not attempted to verify Mr. Lawson's previous employment and that factor had no impact on her decision. See R.41, Ex.1 at 42.

After he was denied a job by CSX, Mr. Lawson made, without success, other efforts to find employment. Ultimately, following the filing of this lawsuit, CSX hired Mr. Lawson for the conductor trainee job despite the fact that it still maintained that his work history did not qualify him for the position. Mr. Lawson has worked for CSX in Terre Haute, Indiana, since January 18, 1999.

B.  Proceedings in the District Court

Mr. Lawson filed suit against CSX on August 27, 1998, claiming that the company refused to hire him because of his disability, insulin-dependent diabetes, in violation of the ADA. In its motion for summary judgment, CSX argued that Mr. Lawson was not qualified for the conductor trainee position because "he lacked prior employment history evidencing responsibility, safety and dependability," R.38 at 1, and could not demonstrate that CSX's reason for rejecting him was a pretext for discrimination. CSX further argued that, under the standard adopted by the Supreme Court in Sutton v. United Airlines, Inc., 527 U.S. 471 (1999), Mr. Lawson's diabetes is not a disability as defined by the ADA.

The district court granted summary judgment for CSX. The court first held that Mr. Lawson was not disabled under the Act because he could not

demonstrate that his diabetes rendered him substantially limited in a major life activity, nor could he provide a record of his having been substantially limited in a major life activity in the past. The district court also held that, even assuming Mr. Lawson could set forth a prima facie case of discrimination under the ADA, summary judgment was proper because CSX had provided "a legitimate nondiscriminatory reason for its decision not to hire him and Lawson has not shown that CSX's reason was pretextual." R.60 at 42-43. Mr. Lawson then appealed to this court.

II
DISCUSSION
A.  Standard of Review

We review the district court's grant of summary judgment de novo, viewing the record in the light most favorable to Mr. Lawson. See Gorbitz v. Corvilla, Inc., 196 F.3d 879, 881 (7th Cir. 1999). We shall affirm a grant of summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A grant of summary judgment will not be sustained if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Mr. Lawson has employed the burden-shifting methodology set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this approach, he must show: (1) that he is disabled within the meaning of the ADA, (2) that he was qualified for the conductor trainee position at CSX, (3) that he was subject to an adverse employment action, and (4) that the circumstances surrounding the adverse action indicate that it is more likely than not that his disability was the reason for it. See Weigel v. Target Stores, 122 F.3d 461, 465 (7th Cir. 1997); see also Leffel v. Valley Fin. Servs., 113 F.3d 787, 794 (7th Cir. 1997). If Mr. Lawson succeeds in demonstrating the elements of a prima facie case, CSX must then offer a lawful, nondiscriminatory reason for its adverse action. See Silk v. City of Chicago, 194 F.3d 788, 799 (7th Cir. 1999). If CSX does so, Mr. Lawson must rebut that reason by showing that the proffered reason is actually a pretext for discrimination. See id. Of course, because Mr. Lawson's appeal here is in response to a grant of summary judgment for CSX, he need only show that a genuine issue of material fact exists as to these factors.

B.  Establishment of a Disability under the ADA

1.

We first examine whether a jury could find that Mr. Lawson is disabled within the meaning of the ADA, such that he could establish the first part of his prima facie case. In an effort to prove that he was disabled under the Act's definition, Mr. Lawson contended in the district court that his diabetes substantially limited him in the major life activity of eating. We now address his arguments in this regard.

The ADA defines a "disability" as: (1) "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual, (2) "a record of such an impairment," or (3) "being regarded as having such an impairment." 42 U.S.C. sec. 12102(2). With regard to the first method of demonstrating a disability, whether an individual has "a physical or mental impairment that substantially limits one or more of the major life activities," the Supreme Court of the United States has instructed us to address the following inquiries:

First, we consider whether [the individual's claimed disability] was a physical impairment. Second, we identify the life activity upon which [the individual] relies . . . and determine whether it constitutes a major life activity under the ADA. Third, tying the two statutory phrases together, we ask whether the impairment substantially limited the major life activity.

Bragdon v. Abbott, 524 U.S. 624, 631 (1998).

We have no difficulty in determining that Mr. Lawson's insulin-dependent diabetes and related medical conditions are physical impairments under the Act. As the district court noted, Mr. Lawson's diabetes affects "many of the organ systems in his body," including his "metabolic, vascular, urinary, and reproductive systems as well as his joints and eyes," and negatively impacts his depression and high blood pressure. R.60 at 29; see also 45 C.F.R. sec. 84.3(j)(2)(i) (defining "[p]hysical or mental impairment").

We also conclude that eating is a "major life activity" as defined by the ADA. Equal Employment Opportunity Commission regulations interpreting the ADA define "major life activity" by providing a non-exhaustive list that includes "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. sec. 1630.2(i); see also Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship, 209 F.3d 678, 683 (7th Cir.

2000); cf. Bragdon, 524 U.S. at 638-39 (citing similarly worded Rehabilitation Act regulations). Such activities need not have a public or economic character to them; they must simply be "central to the life process itself." Bragdon, 524 U.S. at 638. Clearly, the ability to eat is integral to one's daily existence, as much or more so than the activities listed in the implementing regulations. As a result, we hold that eating constitutes a "major life activity" for purposes of the ADA. See Forest City Daly Hous., Inc. v. Town of North Hempstead, 175 F.3d 144, 151 (2d Cir. 1999) (eating is a major life activity for purposes of ADA coverage); Land v. Baptist Med. Ctr., 164 F.3d 423, 424 (8th Cir. 1999) (same); Erjavac v. Holy Family Health Plus, 13 F. Supp.2d 737, 746-47 (N.D. Ill. 1998) (same).

The protections of the Act only apply, however, when it is demonstrated that the disability of the individual "substantially limits" a major life activity such as eating. The Supreme Court has held that, in determining whether a claimed disability is substantially limiting, we must examine the plaintiff's condition as it exists after corrective or mitigating measures used to combat the impairment are taken into account. See Sutton, 527 U.S. at 482. Therefore, in Mr. Lawson's case, we must consider the beneficial effects of his diabetes medication in determining whether his diabetic condition substantially limits his ability to eat.

Here, we cannot accept the district court's conclusion that Mr. Lawson could be substantially limited in his ability to eat only if his "actual physical ability to ingest food is restricted." R.60 at 36. This construction of the statutory phrase "substantially limits" conflicts with the Supreme Court's recognition that the ADA "addresses substantial limitations on major life activities, not utter inabilities." Bragdon, 524 U.S. at 641. The district court failed to consider the extent of the restrictions imposed by Mr. Lawson's treatment regimen and the consequences of noncompliance with that regimen. In doing so, the court prevented Mr. Lawson from showing that, although he is not incapable of ingesting food, his diabetes produces a "substantial limitation" on his ability to perform the basic life function of eating.

The record contains undisputed testimony that, even when taking insulin, Mr. Lawson's "ability to regulate his blood sugar and metabolize food is difficult, erratic, and substantially limited." R.58, Ex.1 at 4 para. 18. Additionally, "Lawson cannot simply eat when and where he wants to, or exert himself without concern for the

effect the exertion will have on his glucose levels. . . . [Instead, he] must always concern himself with the availability of food, the timing of when he eats, and the type and quantity of food he eats." Id. para. 15.

Moreover, the district court's characterization of the impact that Mr. Lawson's diabetes has on his ability to eat, described in its opinion as requiring "simple dietary restrictions," R.60 at 37, belies the severity of the restrictions that he must follow if he is to avoid dire and immediate consequences. On a daily basis, Mr. Lawson must endure the discomfort of multiple blood tests to monitor his blood glucose levels. He also must adjust his food intake and level of exertion to take into account fluctuations in blood sugar. When his blood sugar drops, he "must stop all other activities and find the kinds of food that will bring his levels back to normal or he will experience disabling episodes of dizziness, weakness, loss of mentation and concentration, and a deterioration of bodily functions." R.58, Ex.1 at 4 para. 14. Mr. Lawson's physician characterized the measures he must take to manage his disease as "a perpetual, multi-faceted and demanding treatment regime" requiring "continued vigilance." Id. at 3 para. 11. If Mr. Lawson fails to adhere strictly to this demanding regimen, the consequences could be dire: he could experience debilitating, and potentially life-threatening, symptoms. This evidence is sufficient for a jury to find that Mr. Lawson is substantially limited with respect to the major life activity of eating. See, e.g., Sutton, 527 U.S. at 491 (defining "substantially limits" as meaning "considerable or specified to a large degree") (citation and internal quotation marks omitted).

It is the severity of these limitations on his ability to eat that distinguishes Mr. Lawson's situation from that of other individuals who must follow the simple "dietary restrictions" that medical conditions sometimes entail. See, e.g., Weber v. Strippit, 186 F.3d 907, 914 (8th Cir. 1999) (unspecified "dietary restrictions" prescribed for treatment of heart disease were "moderate limitation[ ]" on eating), cert. denied, 120 S. Ct. 794 (2000); Land, 164 F.3d at 425 (child with peanut allergy was not substantially limited in eating because allergy impacted "her life only 'a little bit'" and only prohibited her from eating foods containing peanuts or their derivatives); Shields v. Robinson-Van Vuren Assocs., Inc., No. 98CIV8785DLC, 2000 WL 565191, at *2-5 (S.D.N.Y. Nov. 8, 2000) (person controlling diabetes with diet and exercise alone not substantially limited in ability to eat when only impact involved

modifications to diet and eating habits, which were not "severe enough"); Ingles v. Neiman Marcus Group, 974 F. Supp. 996, 1001-02 (S.D. Tex. 1997) (person who managed non-insulin-dependent diabetes with oral medications and "a 'normal, good, healthy diet'" with meals "at regular intervals" was not substantially limited in eating). Instead, Mr. Lawson's severe dietary restrictions, and the dangerous consequences that could result from a failure to maintain them, are more analogous to other cases in which the potential for a "substantial limitation" on the ability to eat was found. See, e.g., Erjavac, 13 F. Supp.2d at 746 (issue of fact raised when insulin-dependent diabetic, viewed in treated form, "must eat constantly to prevent blood sugar fluctuations," must "stop all other activities and pursue . . . food[ ]" when blood sugar drops, and must self-inject insulin "several times a day"); Gonsalves v. J.F. Fredericks Tool Co., 964 F. Supp. 616, 621 (D. Conn. 1997) (genuine issue of fact created when affidavit and deposition testimony produced evidence that diabetic plaintiff had "difficulty" eating and "dizziness and blurry vision when his blood sugar level became high"); Coghlan v. H.J. Heinz Co., 851 F. Supp. 808, 814-15 (N.D. Tex. 1994) (genuine issue of fact created when insulin-dependent diabetic, viewed in treated form, experienced hypoglycemia, creating debilitating state, that could only be alleviated by eating), rev'd on other grounds, Washington v. HCA Health Servs. of Texas, Inc., 152 F.3d 464, 469 (5th Cir. 1998), vacated, 527 U.S. 1032 (1999).

These same considerations--the demands of the regimen and the effects of noncompliance--also make this case quite unlike the situation before the Supreme Court in Sutton. The wearing of corrective lenses to neutralize the effects of myopia, at issue in Sutton, 527 U.S. at 475, involves none of the coordination of multi-faceted factors or the constant vigilance that, according to this record, Mr. Lawson must demonstrate on a daily basis. Moreover, in Sutton, the Supreme Court noted that "any negative side effects suffered by an individual resulting from the use of mitigating measures" must be taken into consideration. Id. at 484; see also Moore v. J.B. Hunt Transport, Inc., 221 F.3d 944, 952 n.4 (7th Cir. 2000); Krocka v. City of Chicago, 203 F.3d 507, 513 (7th Cir. 2000). As we have previously noted, the multiple insulin injections that Mr. Lawson takes each day can cause symptoms of hypoglycemia, creating a condition where the level of glucose in his blood is too low. When Mr. Lawson's blood sugar is reduced to such low levels, he suffers from symptoms including "slur[red] speech, profuse sweating, paleness, shaking, unsteady walk, and

fruity odor breath." R.41, Ex.2 at 4 para. 25. These symptoms will lead to "dizziness, weakness, loss of mentation and concentration, and a deterioration of bodily functions" if Mr. Lawson does not eat immediately. R.58, Ex.1 at 4 para. 14. The evidence thus shows that, every day of his life, Mr. Lawson must deal with the concern that the insulin he injects to treat his illness will itself bring about debilitating symptoms that can only be ameliorated by immediately eating certain foods.

In explaining why mitigating measures should be taken into account in defining an ADA disability, Sutton indicated that "[a] diabetic whose illness does not impair his or her daily activities," after utilizing medical remedies such as insulin, should not be considered disabled. Id. at 483. This statement does not mean, however, that no diabetic can ever be considered disabled under the ADA's meaning. Such an approach would contradict the Court's view that whether a person is disabled under the ADA is an individualized inquiry based on the particular circumstances of each case. See id. Moreover, as we have explained, the particular nature of Mr. Lawson's diabetes, even after treatment, could be said to significantly impair his daily activities, unlike the situation in Sutton.

Additionally, in Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499 (7th Cir. 1998), this court also noted that in determining whether an impairment can be said to "substantially limit" the major life activity of the individual, a court ought to consider the nature and severity of the limitations, the actual or expected duration of the impairment, and the actual or anticipated long-term impact of the impairment. See id. at 506 n.3 (citing 29 C.F.R. sec. 1630.2(j)(2)). The record before us establishes that Mr. Lawson's impairment is serious and severe. He has a life-long medical history of Type I diabetes, he suffers from a number of diabetes-related medical problems, and the very medication that he uses to control his diabetes causes severe symptoms that have potentially life-threatening consequences. The duration of the illness also seems to be well-established. Mr. Lawson was diagnosed with Type I diabetes soon after birth, a disease that will remain with him throughout his life. With respect to prognosis, Dr. Skierczynski predicted "to a reasonable degree of medical certainty that even with continuous medical treatment and monitoring of his disease, Lawson has not been able to properly control his blood sugar levels for several years . . . and his medical condition will continue to deteriorate over time as a direct consequence of his diabetes." R.58, Ex.1

at 5 para. 19.

From all the evidence in the record, a jury could find that the prescribed treatment Mr. Lawson must take to survive with diabetes causes symptoms that substantially limit the major life activity of eating. Therefore, the district court erred in holding that Mr. Lawson could not establish an issue of fact regarding the first part of his prima facie case under the McDonnell Douglas test.
2.

As we have noted, the ADA also defines a disability as "a record" of a physical or mental impairment that substantially limits one or more of the major life activities. See 42 U.S.C. sec. 12102(2)(B). We believe that sufficient evidence exists that there is a "record" that Mr. Lawson's diabetes has limited substantially his ability to work in a broad class of jobs. See Sutton, 527 U.S. at 491.

Mr. Lawson testified that, in his younger years, he was "in and out of hospitals quite a bit." R.41, Ex.3 at 32. He also indicated that he had frequent insulin reactions that caused him to drop items, get "the shakes, headaches," and "occasionally . . . pass out." Id. Dr. Skierczynski stated that Mr. Lawson continues to experience hyperglycemia and hypoglycemia and, indeed, endured a "severe hypoglycemic reaction" in 1995, when he became confused and briefly lost consciousness. R.58, Ex.1 at 2 para. 6(f). The record also contains evidence of numerous chronic or recurring medical conditions symptomatic of Mr. Lawson's diabetes.

Additionally, there is evidence that these maladies inhibited Mr. Lawson's ability to maintain any significant employment for a number of years. Mr. Lawson maintains that soon after his high school graduation, between 1985 and 1986, he had to quit his job with a small construction company when he "had a serious insulin reaction and could no longer work." R.41, Ex.2 at 2 para. 7. Moreover, in August 1986, Mr. Lawson's application for SSDI benefits was granted, and he continued to receive total disability benefits until November 1998. During that 12-year period, the Social Security Administration ("SSA") reviewed Mr. Lawson's medical condition every two years and determined that he continued to meet its definition of disability, allowing Mr. Lawson continually to receive benefits./9

We believe that a jury could conclude, from this evidence, that Mr. Lawson can show that a record exists indicating that his diabetes has limited

substantially his ability to work./10

Important in this determination is Mr. Lawson's receipt of disability payments under the Social Security Act and the facts surrounding that determination. The Social Security Act provides income replacement to an individual who "is under a disability," a term defined as an "inability to engage in any substantial gainful activity by reason of any . . . physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. sec. 423(d)(1)(A). To obtain an award of SSDI benefits, Mr. Lawson had to demonstrate that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. sec. 423(d)(2)(A). The Supreme Court has held that evidence of the receipt of SSDI benefits regarding a claimed disability should not be a dispositive factor in ADA disability determinations. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 802-05 (1999). The Court also has indicated, however, that an SSA determination of disability can be relevant and significant evidence in showing that a disability exists for ADA purposes. See id. at 806; see also Feldman v. American Mem'l Life Ins. Co., 196 F.3d 783, 791 (7th Cir. 1999); Weigel, 122 F.3d at 467-68.

More specifically, in Cleveland, the Supreme Court noted that because of differences in the mechanics of the SSA and ADA determinations of disability, a person could be considered disabled by the SSA but yet also be a "qualified individual with a disability" according to the ADA. See id. at 802-03. Yet it also explained that the two acts were similar enough in this regard to require a person, seeking to show that he is "qualified" to perform a job under the ADA's meaning, to provide a "sufficient explanation" as to how this does not conflict with the SSA's determination that he was "unable to work." Id. at 806.

Moreover, some of the differences cited by the Court in Cleveland between the SSA and ADA disability determinations are not applicable to Mr. Lawson in deciding whether he can satisfy the first prong of the prima facie case. The Court noted that the SSA does not take into account the idea of "reasonable accommodation" in its disability determination, meaning that an otherwise disabled person according to the SSA could be "qualified" under the ADA when such an accommodation is considered. Id. at 803. The

reasonable accommodation principle may be relevant at trial regarding the second element of Mr. Lawson's prima facie case, whether he is qualified for the position sought. But see Feldman v. American Mem'l Life Ins. Co., 196 F.3d 783, 790 (7th Cir. 1999) (explaining that the severity of a disability may change over time such that an individual is totally disabled when applying for SSDI, but "later [is] a qualified individual at the time of the employment decision disputed in an ADA suit"). However, it does not affect the basic definition of a disability according to the two acts. In fact, the language considered by the SSA and the ADA in defining disability with regard to the ability to work, without taking into account the ADA's reference to reasonable accommodation, is somewhat similar. Compare 42 U.S.C. sec. 423(d)(2)(A) (regarding SSDI benefits, person must demonstrate that he cannot "engage in any . . . kind of substantial gainful work which exists in the national economy") with Sutton, 527 U.S. at 491 (person disabled under ADA if substantially limited in ability to hold a "broad class of jobs").

Additionally, the Court explained that, because the SSA often uses presumptions in its disability findings, particularly by automatically finding that a disability exists if it is one of a number of "listed impairment[s]," a determination that someone is disabled under the SSA's administrative rules may not mean that he is also disabled according to the ADA's more fact-intensive inquiry. Id. at 804. However, although there was uncertainty over this point during oral argument, it appears that Mr. Lawson's insulin-dependent diabetes is not a listed impairment under the SSA and that a more individualized determination was necessary to allow his receipt of SSDI benefits.

Lastly, the district court noted that Mr. Lawson's brief employment with two companies between 1986 and 1991 showed that "Social Security's determination that Lawson should be on total disability is not tantamount to a conclusion that he was substantially limited in his ability to work." R.60 at 42. We do not disagree that Mr. Lawson's employment in these jobs makes it somewhat less likely that he can demonstrate a record of disability during this time period. However, we believe that such limited work activity does not provide sufficient justification to take this question out of the hands of the jury, in light of all of the evidence presented in this case.

Mr. Lawson's receipt of SSA benefits over a twelve-year period from 1986 to 1998, and the factual circumstances surrounding it, constitute

significant evidence that his diabetic condition rendered him unable to work in a broad class of jobs during that time. Although this evidence is not dispositive of the issue, and is not the only factor upon which we rely in this determination, it gives force to Mr. Lawson's claim that a record of disability exists. Mr. Lawson's evidence, taken as a whole, is sufficient for a jury to find he has a record of diabetes substantially limiting his ability to work. Therefore, the district court's determination that Mr. Lawson could not show that he was disabled in this regard under the ADA was also in error. This provides another reason why summary judgment was improper on the ground that the first element of Mr. Lawson's prima facie case could not be met.

C. Remaining Elements of the Prima Facie Case
1.

The district court not only determined that Mr. Lawson's claim failed because he could not demonstrate that he was "disabled" under the ADA, but it also noted that it "d[id] not believe Lawson has sufficiently established the remainder of his prima facie case." R.60 at 43 n.18 (italics omitted). Yet the court provided no discussion of its determination in that regard; it explained that, because in its view the case could be decided on the disability prong of the test, it would not "attempt to resolve" the disputes as to the remainder of the elements of Mr. Lawson's prima facie case. Id. Despite the lack of specific findings by the district court, we may affirm its grant of summary judgment on any ground supported by the record. See Conley v. Village of Bedford Park, 215 F.3d 703, 710 (7th Cir. 2000). We cannot do so here, however, because the record demonstrates that a genuine issue of material fact exists as to whether Mr. Lawson can satisfy the remainder of his prima facie case.

The second prong of the prima facie case requires Mr. Lawson to show that he was qualified for the position of conductor trainee at CSX. A determination as to whether a person is qualified for an employment position under the ADA involves a two-step inquiry: (1) the employee must possess "the appropriate educational background, employment experience, skills, licenses, etc." and (2) he must also be able to "perform the essential functions of the position held or desired, with or without reasonable accommodation." Bay v. Cassens Trans. Co., 212 F.3d 969, 974 (7th Cir. 2000) (quoting 29 C.F.R. app. sec. 1630.2(m)); see also Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 563 (7th

Cir. 1996). CSX does not claim that Mr. Lawson cannot handle the physical demands of the conductor position; instead it asserts that he cannot satisfy the first step of this inquiry because he did not possess a work history evidencing responsibility, safety and dependability.

An employer may define the job in question, "in terms of both its essential scope and the qualifications required for it," Dalton v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667, 676 (7th Cir. 1998), as long as such qualifications are "job-related and consistent with business necessity," Bay, 212 F.3d at 974 (quoting 42 U.S.C. sec. 12113(a); 29 C.F.R. sec. 1630.15(b)(1)). There is, on this record, a jury question as to whether an employment history demonstrating responsibility, safety and dependability was a genuine requirement for the position of conductor trainee at CSX. The record shows that such a work history was not among the prerequisites listed on CSX's job description for conductor trainee that it provided to interested applicants at Cincinnati State. Additionally, CSX had no guidelines defining this unstated qualification, and the district court noted that the company not infrequently made "exceptions" to this criterion by hiring persons with "limited or unskilled employment experience, applicants whose employment could not be verified, applicants without a high school diploma or GED, and even applicants with criminal records including unresolved felony convictions." R.60 at 44.

Moreover, not only has CSX submitted the applications of a number of people hired for the conductor trainee position who seem not to have possessed this CSX prerequisite, see supra note 8 and accompanying text, but Ryan also admitted that it was not unusual for her to hire people who did not have a "solid" employment background. Her description of the variety of exceptions to this requirement calls into question whether it was actually an essential feature for a conductor trainee applicant:

There is an exception here that business ownership can be substituted for employment. Part-time work with concurrent volunteer community service can substitute for full-time employment. Part-time work while attending college can substitute for full-time employment. Acceptable explanations for gaps in employments or layoffs or downsizing [also qualifies as an exception]. . . . If someone has been in school and doesn't have a solid verifiable work history, then we'll look at their college, what type of school work they've been doing . . . .

R.39, Ex.3 at 77. Ryan went on to describe one applicant who did not have a "solid work history" but whom she hired because he had done significant volunteer work in high school; when questioned whether she asked Mr. Lawson if he had such volunteer experience, Ryan admitted she had not, explaining that it was up to the applicants to "sell themselves." Id. at 77-78.

CSX relies upon our decision in Holder v. Old Ben Coal Co., 618 F.2d 1198 (7th Cir. 1980), for the proposition that even though a job qualification may not be published, it may still be a requirement for an employment position. Holder was a Title VII case involving the question of whether a plaintiff was "qualified" under the terms of that statute for an "unskilled" mining position. Id. at 1200. There the plaintiff had argued that because the job in question was labeled "unskilled," it required no particular qualifications, and thus she was necessarily qualified for the position. See id. We held that, although the defendant had not listed any job requirements for the position, that did not mean that it did not look for certain qualifications in its applicants. See id. However, the decision in that case turned on the fact that the defendant, in hiring "unskilled" workers, "primarily sought persons who had operated mobile equipment or had worked with heavy equipment" and "consistently sought applicants for unskilled positions with mining related experience," qualities the plaintiff did not possess. Id. at 1200 & 1202. Additionally, we explained that the term "unskilled" worker, in the context of the defendant's line of work, was also simply a way for the company to describe a job that was not a "skilled" position. A "skilled" position was one that required "technical ability," defined as "a minimum of six months experience as a dragline operator, shovel operator, machinist, electrician, welder, mechanic, bulldozer operator, overburden driller, or overburden shooter." Id. at 1200-01. We also noted that the evidence "fail[ed] to show that [the] defendant ever sought or hired anyone with experience comparable to plaintiff's." Id. at 1202. In contrast to the plaintiff in Holder, we believe that Mr. Lawson has put forward enough facts to create a jury question as to whether CSX consistently required applicants to have a responsible, safe, and dependable work history. Additionally, he has shown that the company hires persons with employment histories that are not significantly different from the limited experience he possessed./11

As to the fourth element/12 of the prima facie case, whether the circumstances surrounding the company's decision make it more likely than

not that Mr. Lawson's disability was the reason why CSX did not hire him, we also believe that a jury question exists on these facts. Mr. Lawson informed Ryan and Layne that he was a diabetic, a condition that previously had rendered him unable to work and for which he had been receiving SSDI benefits for a number of years. CSX then failed to hire Mr. Lawson as a conductor trainee, despite the fact that he completed the training program at Cincinnati State with a high quiz average and met the listed requirements for the position in the job description that CSX provided to the school. The evidence also shows that CSX was not a particularly selective employer with regard to its hiring from programs like Cincinnati State's. Indeed, it hired 98% of all successful program participants, and it hired every other member of Mr. Lawson's program class. CSX claimed that Mr. Lawson's sparse work history was the reason it did not hire him. However, as we have noted, there is a serious question as to whether such a work history was truly a job requirement for CSX, and Ryan's admission that she had significant discretion in making exceptions to this requirement particularly calls into question the importance of this criterion to the company.

These facts, considered together, could support a jury's determination that CSX more likely than not refused to hire Mr. Lawson as a conductor trainee because it knew that he was an insulin-dependent diabetic. As a result, Mr. Lawson has demonstrated a genuine issue of fact with regard to each element of his prima facie case of discrimination.

2.

CSX did come forward with a legitimate, nondiscriminatory reason for its refusal to hire Mr. Lawson. As discussed previously, it claimed that he lacked a prerequisite for the conductor trainee job because he did not have a work history evidencing responsibility, safety or dependability and because he offered CSX no reason to make an exception to that rule. Mr. Lawson must then be afforded the opportunity to demonstrate that this reason was a pretext for discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2106 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993). Mr. Lawson may succeed in his demonstration of pretext by offering evidence that CSX's "proffered explanation is unworthy of credence." Reeves, 120 S. Ct. at 2106 (citation omitted). For many of the same reasons why Mr. Lawson has created a genuine issue of fact regarding the elements of the prima facie case, there is also sufficient evidence to permit a

jury to conclude that the reason given by CSX as to why it did not hire Mr. Lawson was pretextual./13 See Reeves, 120 S. Ct. at 2106 (noting that "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual") (citation and internal quotations omitted). These facts are sufficient to allow a jury to disbelieve CSX's proffered nondiscriminatory explanation for its action and to "believe [Mr. Lawson's] explanation of intentional discrimination." Id. at 2108 (emphasis and citation omitted).

Ultimately, Mr. Lawson has demonstrated a genuine issue of material fact as to whether discrimination regarding his status as an insulin-dependent diabetic was the true motivation for CSX's employment decision--one that made Mr. Lawson that exceedingly rare employee who passed CSX's training program for the position of conductor trainee with flying colors, met all of the qualifications CSX listed for the position, and yet was not hired by the company. We express no view on whether Mr. Lawson ultimately will be successful at trial, but we believe the evidence in the record demonstrates that his case deserves to be heard by a jury.


Conclusion

For the reasons set forth in this opinion, the judgment of the district court is reversed, and this case is remanded for proceedings consistent with this court's opinion.

REVERSED AND REMANDED


/1 Dr. Paul Skierczynski, a board-certified endocrinologist who has treated Mr. Lawson since 1996, described the severity and treatment of Mr. Lawson's medical condition. See R.58, Ex.1.

2/ Dr. Skierczynski noted that insulin is not a cure for diabetes but is instead a tool used to treat its symptoms. He went on to describe how insulin can cause diabetic hypoglycemia and the physical effects of that condition:

Too much insulin can cause hypoglycemia, a condition where the level of glucose in the blood is too low. Hypoglycemia can also occur when a person has not eaten enough food or has exercised without extra food. A person with hypoglycemia may be nervous, shaky, weak or sweaty and experience headaches and blurred vision.

R.58, Ex.1 at 4 para. 9.

/3 To treat these related conditions, Mr. Lawson must take "a lot" of other medications "on top of" his multiple insulin injections. R.41, Ex.3 at 12-13. Every day, Mr. Lawson takes three 50 mg. tablets of Captopril, a blood pressure and a kidney medication; two doses of Lindoe, an arthritis medication; one dose of Liptoril each evening for cholesterol; and two different types of insulin. Mr. Lawson also takes two doses of Serzone each day, a medication that treats depression; according to Dr. Skierczynski, Mr. Lawson has a "history of attempted suicide and ongoing current depression" that also hinders Mr. Lawson in attempting to control his glucose levels. R.58, Ex.1 at 2 para. 6(c).

/4 The district court did not consider evidence of this employment experience, described in Mr. Lawson's affidavit, because the court believed that it was contradicted by Mr. Lawson's prior deposition testimony. See R.60 at 9-10 n.4 ("Unless there is a compelling reason to the contrary, we do not permit a witness to contradict his own deposition testimony by subsequent affidavit created in an effort to change the facts previously testified to." (citing Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir. 1995))). In his affidavit, Mr. Lawson stated that he worked for this company between 1985 and 1986. In his earlier deposition, he was asked about his work history and stated that he did no work in 1984 and 1985, with the exception of his work at his parents' kennel. Although he did not mention the construction job in this line of questioning, he was asked no questions regarding his work history generally in 1986, only specific questions about his employment with particular companies. To the extent that this construction work may have occurred during 1986, Mr. Lawson's affidavit does not necessarily contradict his deposition testimony in this regard. Given the ambiguity of the deposition testimony, we cannot say that the subsequent affidavit directly contradicts Mr. Lawson's statements in the deposition. Therefore, we shall consider evidence of this employment experience in this appeal.

/5 CSX hires successful graduates of the Cincinnati State training program as conductor trainees, with the expectation that they will be promoted to the job of conductor. A railroad conductor at CSX "coordinates activities of train crews engaged in transporting freight" and "supervises the activities of switch engine crews engaged in switching railroad cars within a yard or industrial plant to facilitate the loading and

unloading of cars and the making up and breaking up of trains." R.38 at 3-4 para.para. 9-10. The conductor's job is described as "dangerous and physically demanding" as "[c]onductors work outdoors much of the time, with many distractions, and they perform activities on and around moving equipment." Id. at 4 para.para. 11-12. Although CSX does not own or operate the Cincinnati State training program, or select program participants, there is a close connection between CSX and the program. For example, CSX provides training materials for the program, CSX employees have served as instructors in the program, and "[a]ll enrollees in good standing in the [program] are offered an interview for a conductor trainee position with CSX." Id. at 5 para. 30.

/6 During the conductor training program, CSX interviews participants in good standing to fill job openings as conductor trainees. Job offers are "contingent upon successful completion of the railroad conductor course." R.38 at 6 para. 32.

/7 Although CSX disagrees with much of Mr. Lawson's recollection as to what was said about his diabetes during this interview, a few specifics are not in dispute. Both parties agree that: (1) Mr. Lawson informed Ryan and Layne that he had diabetes, (2) he represented that his condition had prevented him from working during at least some years in the past, and (3) at the time of the interview he was physically able to perform the job of conductor at CSX.

/8 During discovery, CSX produced the applications of successful candidates for the conductor trainee position who listed previous employment consisting of only a few months of very limited work experience. These candidates included the following examples: a man who had worked 3 months part-time moving and assembling furniture; another who had worked one month part-time as a lawn service helper, one month part-time as a busboy/dishwasher, and two months part-time as a dishwasher; another who had worked 10 months part-time driving a bread delivery truck; another who had worked full-time one summer as a foreman on a road crew; another who had worked one month full-time on a farm, and one month part-time as a supermarket stocker; and another who had worked four months full-time stocking groceries.

/9 During this time, Mr. Lawson actively sought employment, but he was actually employed for only two brief periods: in the summer of 1988 he worked for a moving company, and in 1991 he maintained a three-month, part-time job with a salvage company.

/10 Along with a showing that a record of a substantially limiting impairment exists, a plaintiff must also demonstrate that the employer knew of that record. See Davidson, 133 F.3d at 510 n.8. The facts of this case could support a finding that CSX was aware of Mr. Lawson's disability and the effect that it had on his work history. During his job interview with CSX, Mr. Lawson maintains that he told CSX representatives Ryan and Layne that his lack of work experience was due to his diabetic condition, and he explained that he had been "totally disabled for a number of years," R.41, Ex.2 at 3 para. 16, and was presently receiving disability benefits.

/11 We offer no opinion on the question of whether, even if CSX could show that a work history demonstrating responsibility, safety and dependability was a bona fide qualification for the conductor trainee job, that quality "bears more heavily on disabled than on other workers and is not required by the necessities of the business or activity in question." Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1195-96 (7th Cir. 1997); see also 29 C.F.R. sec. 1630.10. We also make no judgment regarding whether Mr. Lawson has waived such a disparate impact claim, as CSX alleges. See Appellee's Brief at 42-43.

/12 The parties do not dispute the satisfaction of the third element of the test, that Mr. Lawson suffered an adverse employment action.

/13 We also note, as the district court described in its opinion, that there is evidence suggesting that CSX has produced other explanations in the past for the decision not to hire Mr. Lawson, some of which have not been accurate. See R.60 at 44 n.19. For example, Ryan initially claimed that her inability to verify the work history that Mr. Lawson had provided in his application was a factor in CSX's denial of his application. Ryan later admitted, however, that the verifiable nature of Mr. Lawson's previous employment played no role in her ultimate employment decision. Indeed, she did not attempt to substantiate Mr. Lawson's work history before informing him that he would not be hired by CSX. Next, in its response to Mr. Lawson's earlier complaint filed with the Indiana Civil Rights Commission ("ICRC"), CSX submitted to the ICRC that not only its inability to verify Mr. Lawson's work history, but also Mr. Lawson's misrepresentation of that work history, were factors in its employment decision. However, CSX later admitted that concerns about misrepresentation were not at issue at the time of its decision on Mr. Lawson's status; only after that decision had been made did CSX obtain evidence that Mr. Lawson may have misrepresented his past employment. Lastly, Mr.

Lawson claims that Ryan told him that another reason for her decision was that Mr. Lawson did not have three years of continuous employment at the time he interviewed for the job. Ryan disputes this charge, maintaining that this too was not a reason for her decision not to hire Mr. Lawson. CSX's shifting justifications for its actions in this dispute also provide another basis for concern regarding the company's credibility.

Easterbrook, Circuit Judge, concurring.  I join the court's opinion but add a thought about the significance of the disability benefits that Lawson used to receive.

Lawson contends that the award of disability benefits demonstrates (or at least strongly implies) that he is disabled for purposes of the ADA. To the extent that these benefits (and the administrative determination underlying them) show "a record of such an impairment", 42 U.S.C. sec.12102(2)(B), this contention is straightforward. The ADA does not let an employer use past disability as a reason for refusing to evaluate current abilities; thus it could not say that it does not hire persons who have ever received disability benefits. CSX did not make this its official policy but came close by announcing that it wanted to hire only persons with steady work histories. If Lawson could not work in the past (and was receiving disability benefits on that account) but has improved and can work now (as the Social Security Administration believes), then CSX's work-history filter discriminates on account of Lawson's "record of impairment" memorialized in the award of disability benefits. Although CSX contends that it made exceptions (and would have allowed a year of flipping burgers to suffice), on summary judgment we must draw the inferences in Lawson's favor.

To the extent that Lawson believes the decisions of the Social Security Administration to have any other significance, I am skeptical. Cleveland v. Policy Management Systems Corp., 526 U.S. 795 (1999), holds that the definition of disability under the Social Security program differs from the definition of disability under the ADA, so that receipt of Social Security benefits does not necessarily establish that a person is not "a qualified individual with a disability" under the ADA. See 42 U.S.C. sec.12112(a). Although the difference in legal standards-- and in the

identity of the decisionmaker (an administrative law judge versus a federal court)--means that the award of benefits is not conclusive, the representations a person makes in an effort to obtain benefits may be significant. A person who tells the SSA that he is bedridden, for example, can't pursue an ADA claim that depends on his being spry. This is one point of Wilson v. Chrysler Corp., 172 F.3d 500 (7th Cir. 1999), which held that an employee's representation to the Social Security Administration that she is a paranoid schizophrenic precluded her argument in employment litigation that she is mentally stable and fit to work. Neither Lawson nor CSX seems interested in making anything of Lawson's representations to the agency, however; instead Lawson wants to use the unelaborated award of benefits to show that he is today a person "with a disability" under sec.12112(a), and that step is hard to reconcile with Cleveland.

Treating the SSA's decision as something that matters independent of "a record of impairment" would send district courts (and juries) on a lot of byways. If a grant of disability benefits boosts an employee's claim, then a denial also would be admissible at the employer's behest. Judges then would need to tell juries what the SSA's standards are, how they differ from the standards under the ADA, what to make of the fact that Social Security proceedings are non-adversarial (and that employers are not parties to them), and so on. Cleveland suggests that this is a path best avoided. Presumably the ALJ's opinion granting (or denying) disability benefits would be admissible and become a topic of debate at trial; and if benefits were granted (or denied) without an ALJ's involvement, things might be even murkier.

Litigants often try to introduce agency dispositions in suits under Title VII, but courts have concluded that neither a finding by the EEOC that discrimination occurred, nor a finding of no discrimination, has legal consequences or would promote accurate decisionmaking by juries. Lang v. Kohl's Food Stores, Inc., 217 F.3d 919 (7th Cir. 2000), collects a few of these decisions. I don't see any reason to treat agency determinations differently under the ADA. Using disability benefits solely to demonstrate "a record" of impairment avoids these problems. And if the employer concedes that the plaintiff has "a record" of impairment, then it should be possible to keep the administrative decision out of evidence altogether. Cf. Old Chief v. United States, 519 U.S. 172 (1997).