In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-3258

DOCK TIMMONS,

*Plaintiff-Appellant,*

*v.*

GENERAL MOTORS CORPORATION,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 3045—**Blanche M. Manning**, *Judge.*

---

ARGUED MARCH 29, 2006—DECIDED DECEMBER 7, 2006

---

Before BAUER, KANNE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Dock Timmons ("Timmons"), who suffers from multiple sclerosis, sued General Motors ("GM") for violating the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, after GM involuntarily placed him on disability leave. The district court awarded summary judgment to GM and Timmons appeals. He claims the district court applied the wrong legal test to his case and the evidence establishes a material factual dispute regarding GM's reason for placing him on disability leave. We affirm.

## I.  Background

Timmons began working for GM in 1974, and by 1999 he had become one of only five Customer Activities Managers nationwide. As a Customer Activities Manager, Timmons handled (among other things) customer relations issues at GM dealerships within his region and at GM's customer call centers in Florida, Texas, and California. His job required a valid driver's license—Timmons has one, though he had not taken a driving test for at least four years before he was put on disability leave—and a willingness and ability to travel as much as fifty percent of the time. Timmons attended dealer meetings in Illinois and other states and represented GM at arbitrations and court hearings. He also attended monthly meetings at various locations around central and northern Illinois and in Wisconsin. From time to time Timmons's job also required him to drive to meetings in Ohio and Michigan and, as already mentioned, to attend to business in customer call centers in Florida, Texas, and California. When asked whether he could imagine performing his job without being able to drive, Timmons responded unequivocally, "No."

In 1992 Timmons was diagnosed with multiple sclerosis ("MS"), a disease of the central nervous system with a variety of symptoms, including visual and sensory impairments and muscle weakness. MS did not stop Timmons's ascent at GM, as evidenced by his 1999 promotion to Customer Activities Manager, but by 2002 it hampered his ability to walk. GM accommodated Timmons's condition, however. It provided Timmons with a motorized scooter and equipped his car with a lift to get the scooter in and out more easily. GM also paid for Timmons to rent scooters when on trips of longer distances. When Timmons told GM that a home office would help him on days when it was difficult for him to come to work, GM obliged. GM also provided Timmons with a modified computer monitor and

keyboard and installed automatic door openers on its front door and restroom doors. On more than one occasion during 2002 and 2003, GM offered Timmons other jobs that required less travel yet maintained his employment level and salary. Timmons declined each one because he believed they would be considered demotions, despite GM's assurances to the contrary.

As Timmons's condition worsened through 2002, his supervisors became concerned about his ability to drive, which was integral to his job. Thomas Tyler, Timmons's supervisor from 1999 through January 2003, says he received reports from area service managers and field personnel that Timmons sometimes drove too slowly on the highways and held up traffic. Tyler discussed the situation in 2002 with Timmons and Joyce Saunders, a GM human resources manager. There was also concern because Timmons had, at least twice, fallen asleep on the job. Saunders shared the concerns with two medical doctors employed by GM, who in turn contacted some of Timmons's personal doctors to discuss their concerns. Two of Timmons's physicians, Drs. Frank and Yang, reassured GM that Timmons could drive safely. Dr. Yang agreed to adjust Timmons's medication in an effort to curtail Timmons's drowsiness. From that point forward there were no more problems with Timmons falling asleep at work.

Besides the driving concerns, GM also had reports of problems with Timmons's work performance. Timmons reportedly missed at least three dealer meetings and, on several occasions, was not in the field when he should have been. Tyler also received reports from service managers that Timmons was not returning their phone calls, though Timmons disputes that. Some of Timmons's superiors also felt he was not coming into the office as frequently as he should have been.

By February 2003 concerns about Timmons's driving abilities were heightened by an incident in which Timmons lost control of his scooter and crashed it in a parking lot.[1] Timmons's new supervisor, James Swinson, also saw Timmons driving too slowly on the expressways and "wandering" back and forth as he drove. In addition, Swinson had information that Timmons's assistant drove him to a meeting in Iowa because Timmons was not comfortable driving. Swinson talked with Timmons about his concerns during March and May 2003. The possibility of disability retirement was raised—Timmons says by Swinson. In fact, Timmons says Swinson had pressured him for several months to retire or go on disability leave.

During the May meeting, Timmons gave Swinson permission for GM to speak with his personal doctors. Timmons wrote Dr. Frank a letter requesting that the doctor release his medical records to a GM physician. Eight days after writing the letter, however, Timmons rescinded his permission. He was concerned GM was looking for a reason to get rid of him. As a result, GM was not given access to Timmons's medical records.

Accordingly, GM asked Timmons to undergo an evaluation by Dr. Roy Lacey, an occupational environmental medicine specialist employed by GM, and Timmons agreed. Dr. Lacey handled all GM issues pertaining to employee health and safety at work, including chronic illnesses, return-to-work evaluations, and fitness-for-duty evaluations; he also helped find suitable positions for employees

---

[1] The parties dispute whether Timmons hit a pothole he could not see and *then* lost control of the scooter or whether he lost control of the scooter *first* and then hit a pothole. Because the case comes to us after summary judgment, we accept, as we must, Timmons's version of the story: he hit a pothole at night, then lost control and crashed.

with medical restrictions. Swinson met with Dr. Lacey alone before the examination to describe Timmons's job responsibilities. Following the examination, Dr. Lacey concluded Timmons had optic atrophy in both eyes, an ataxic gait, severely limited motion in his left arm, and an inability to grasp with or completely close his left hand, twitching in some muscles, a "dropped" left foot (indicating nerve damage in the spine and an increased likelihood that the right side may also be affected), and an inability to turn his neck more than forty degrees on the right and thirty-five degrees on the left (sixty degrees is the normal range of motion). Dr. Lacey also concluded Timmons had poor insight because he believed he had no problems that would prevent him from doing anything he wanted, including performing all aspects of his job. Dr. Lacey met again with Swinson after the examination to confirm Timmons's job required driving and travel and to find out whether GM had other suitable positions it could offer Timmons that did not require driving and travel. GM had no other positions. Timmons was put on disability leave that day.

In September 2004, over a year after Dr. Lacey's exam, Dr. Frank offered a sworn statement that Timmons was capable of driving provided the car was specially fitted with appropriate controls. Timmons remains in GM's employ on paid leave.

The district court granted GM's motion for summary judgment, concluding that Timmons had not presented evidence establishing a prima facie case of discrimination because he had not identified any similarly situated nondisabled employees who had been treated more favorably. The district court also concluded that Timmons had not presented evidence showing that the circumstances of GM's decision to place him on disability leave made it more likely than not that the decision was the result of discrimination in violation of the ADA.

## II. Discussion

Timmons makes two arguments on appeal. First, he contends that the district court improperly required him to show that similarly situated employees received more favorable treatment in order to establish a prima facie disparate treatment claim under the *McDonnell-Douglas* burden-shifting method of proof. According to Timmons, he was required to show only that the circumstances suggest that his disability was more likely than not the reason for the adverse employment action. Second, Timmons maintains that summary judgment should not have been granted to GM because there was a genuine issue of material fact about the reason GM put him on leave.

Summary judgment standards are well-known. We review summary judgments de novo, construing all facts and reasonable inferences in favor of the nonmoving party. *Harrell v. U.S. Postal Serv.*, 445 F.3d 913, 918 (7th Cir. 2006). We will affirm a summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of [his] disability." 42 U.S.C. § 12112(a). In addition to prohibiting adverse employment actions against disabled persons because of their disabilities, the ADA requires employers to make reasonable accommodations for the disabilities of qualified individuals. § 12112(b)(5)(A). It is important for plaintiffs to be clear about whether they are pressing disparate treatment or failure-to-accommodate claims (or both) because the two are analyzed differently. *See, e.g.*, *Hoffman v. Caterpillar, Inc.*, 256 F.3d

568, 572-73 (7th Cir. 2001); *Weigel v. Target Stores*, 122 F.3d 461, 464 (7th Cir. 1997); *Bultemeyer v. Ft. Wayne Cmty. Schs.*, 100 F.3d 1281, 1283-84 (7th Cir. 1996). This case may have had elements of both types of claims, but Timmons has not pressed a failure-to-accommodate claim. Instead, Timmons calls his claim a disparate treatment claim, he frames it as a disparate treatment claim, he analyzes it as a disparate treatment claim, and the district court noted that Timmons crafted only a disparate treatment claim in resisting summary judgment. We agree. This is a disparate treatment case; Timmons waived any failure-to-accommodate claim he may have had. *See Weigel*, 122 F.3d at 464.

As in other disparate treatment employment discrimination claims, a plaintiff may prove discrimination in violation of the ADA using one of two methods. Under the so-called "direct" method, the plaintiff may show either direct or circumstantial evidence that points to a conclusion that the employer acted as it did for illegal reasons. *See Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902-03 (7th Cir. 2006). The alternative way to prove discrimination is the familiar burden-shifting *McDonnell Douglas* method. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Proceeding under this approach, a plaintiff must first make out a prima facie case of discrimination. *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). Once he has done so, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Id.* If the employer makes that showing, the burden shifts once again to the plaintiff to show the employer's stated reason is simply pretext for discrimination. *Id.* The plaintiff's prima facie case typically requires a showing that the plaintiff was disabled, performing satisfactorily, subjected to adverse employment action, and treated less favorably than a nondisabled,

similarly situated person. *See, e.g.*, *Rooney v. Koch Air, LLC*, 410 F.3d 376, 380-81 (7th Cir. 2005); *Hoffman*, 256 F.3d at 572; *Amadio v. Ford Motor Co.*, 238 F.3d 919, 924 (7th Cir. 2001); *Rothman v. Emory Univ.*, 123 F.3d 446, 451 (7th Cir. 1997). At least that is the usual statement of the test.

But it is not the exclusive statement of the test. The *McDonnell Douglas* method of proving discrimination was not meant to be inflexible. *McDonnell Douglas*, 411 U.S. at 802 n.13. Sometimes a plaintiff cannot identify similarly situated employees. *See, e.g.*, *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 794 (7th Cir. 1997). To account for such circumstances, we have said that the fourth prong (and, actually, the test as a whole) really requires a showing "that the circumstances surrounding the adverse action indicate that it is more likely than not that his disability was the reason for it." *Lawson*, 245 F.3d at 922; *see also Weigel*, 122 F.3d at 465; *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396-97 (7th Cir. 2000); *Rehling v. City of Chi.*, 207 F.3d 1009, 1018 n.7 (7th Cir. 2000); *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1230-31 (11th Cir. 1999); *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997); *Leffel*, 113 F.3d at 794; *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58-59 (4th Cir. 1995); *Crawford v. Runyan*, 37 F.3d 1338, 1341 (8th Cir. 1994). A showing, for example, that employees who are situated similarly to the plaintiff in all respects except disability were treated better may give rise to the inference that the plaintiff was treated adversely *because* of his disability. But there are other ways to show the same thing, and that is the reason for the broader formulation of the test.

We have commented before on how this alternative formulation of the *McDonnell Douglas* test is hardly a true version of the test. *Larimer v. Int'l Bus. Machs. Corp.*, 370

F.3d 698, 701 (7th Cir. 2004). After all, if the plaintiff can produce evidence to satisfy the fourth prong of this more broadly stated version of the *McDonnell Douglas* test, he has no need for the *McDonnell Douglas* burden-shifting method to begin with; he has satisfied the direct method using circumstantial evidence. Both approaches require the plaintiff to present evidence indicating it is more likely than not the employer took the adverse action because of the plaintiff's disability. It is often easier to satisfy the "traditional" *McDonnell Douglas* test involving the identification of similarly situated employees. The plaintiff need not show suspicious circumstances surrounding the action against him (which may be difficult in this context); rather, he must show only that others who are similarly situated but not disabled were treated better. What is always true, however, is that whatever evidence or method of proof the plaintiff resorts to, he must put together a case that permits the inference that the employer has acted against him based on his disability. "Any demonstration strong enough to support judgment in the plaintiff's favor if the employer remains silent will do, even if the proof does not fit into a set of pigeonholes." *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996); *see also O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996).

Other cases in our circuit state the prima facie case requirements even more generally. We have said a prima facie case of discrimination is established by showing that the plaintiff (1) is disabled within the meaning of the ADA, (2) is qualified to perform the essential functions of the job with or without accommodation, and (3) has suffered an adverse employment action because of his disability. *See, e.g.*, *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004); *Dvorak v. Mostardi Plat Assocs., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002). The first two requirements are simply restatements of the

statutory elements specifying that the plaintiff must be a
"qualified individual with a disability" in order for the
ADA to apply. 42 U.S.C. §§ 12102(2), 12111(8) (defining
"disability" and "qualified individual with a disability"); 42
U.S.C. § 12112 (protecting "qualified individual with a
disability" from discrimination on the basis of his dis-
ability). In other words, if a plaintiff cannot satisfy these
requirements, he is not covered by the ADA. Once the
plaintiff shows he is protected by the ADA, he can satisfy
the third part of the test by showing, using the direct
method or the indirect *McDonnell Douglas* approach, that
he suffered an adverse employment action because of his
disability. *See Hoffman*, 256 F.3d at 578 (Manion, J.,
dissenting); *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d
1109, 1115 (7th Cir. 2001).

Accordingly, an ADA plaintiff in a disparate treatment
case must show that he is protected by the ADA (a "quali-
fied individual with a disability") and that his employer
violated the ADA by taking adverse action against him
because of his disability. The plaintiff establishes he is
protected by the ADA through evidence that he is dis-
abled within the meaning of the ADA and is qualified to
perform the essential functions of the job with or without
reasonable accommodations. 42 U.S.C. §§ 12102(2),
12111(8), 12112. If he is protected by the ADA, the plain-
tiff may show he has been treated adversely because of
his disability using either the direct method, which
contemplates both direct and circumstantial evidence, or
the indirect method. The indirect method requires a
showing that: (1) the plaintiff was a qualified individual
with a disability (which he will have already established
if he gets this far); (2) he was meeting his employer's
expectations (this is meant in a different sense than the
threshold inquiry of whether he is qualified for the job
with or without accommodations, which is a question of
ADA coverage); (3) he was subjected to an adverse employ-

ment action; and (4) the circumstances suggest that the plaintiff's disability was the reason the employer took adverse action against him. The showing required under the fourth prong of the indirect method may (not must) be made by demonstrating similarly situated nondisabled employees were treated more favorably. If the plaintiff shows all four of these elements, the employer has the burden of showing a legitimate, nondiscriminatory reason for taking adverse action against the plaintiff. If the employer meets its burden, the employee must show the employer's stated reason is pretextual.

Timmons chose to press his claim using the indirect *McDonnell Douglas* burden-shifting method. We have already commented on this method's similarity to the direct method in this context, but no matter how Timmons frames it, he cannot win. Taking as given that Timmons is disabled (this is undisputed) and assuming also that Timmons is a qualified individual with a disability under the ADA (this is disputed), summary judgment was still proper in this case because Timmons has not shown he was meeting GM's expectations, nor is there any evidence suggesting that GM put him on leave because of his disability rather than his inability to perform certain critical aspects of his job.[2]

First, the record establishes that Timmons was not meeting GM's legitimate expectations. There is evidence that Timmons was not at work and in the field when required, and also that he failed to return several phone calls to customers, skipped required meetings, and had his

---

[2]  In a rather basic sense, an employee placed on *disability* leave has been placed in that status *because of* his disability, but this cannot be conclusive for ADA purposes. Otherwise employers providing this form of employment leave will always be liable for disability discrimination.

assistant doing some of his job duties. Timmons disputes some—but not all—of this evidence. For instance, he challenges whether his assistant was doing parts of his job, and he says he returned all his phone calls. Still, he disputes neither his absences from the field and the office nor the skipped meetings. Even if we accept, as Timmons urges, that his past performance reviews establish his prior satisfactory performance, he has not disputed that at the time he was placed on leave, he was failing to meet GM's legitimate expectations in the foregoing respects.

Before continuing on to the fourth element of the indirect method of proof, it is worth commenting on whether Timmons suffered an adverse employment action. GM says not; Timmons is still employed by GM and receives the equivalent of his old salary (through a combination of social security and disability payments) while on disability leave. That argument is a stretch. Money is not the exclusive measure of adverse employment actions. An adverse employment action must be material—more than an inconvenience—but it may take many forms. "For example, . . . a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation" all may indicate an adverse employment action. *Kersting*, 250 F.3d at 1115 (quotations omitted); *see also generally* 42 U.S.C. 2000e-2(a)(1) (Title VII's general description of adverse employment action). The inquiry is contextual and here there is no doubt Timmons's material responsibilities have been diminished. Placing Timmons involuntarily on disability leave was an adverse employment action.

What Timmons must ultimately produce is some evidence suggesting GM's decision to place him on leave was based on his disability rather than some other job-related reason. *Leffel*, 113 F.3d at 794. As we have dis-

cussed, this can consist of evidence that similarly situated nondisabled persons received more favorable treatment or some other evidence permitting an inference of discrimination. Under the indirect method of proof, this analysis often overlaps the pretext analysis. Timmons has not made this showing.

Timmons argues GM had no legitimate business reason to subject him to Dr. Lacey's examination. *See* 42 U.S.C. § 12112(d)(4)(A) (prohibiting medical examinations of employees "unless [the] examination . . . is shown to be job-related and consistent with business necessity"). He also says GM had no right to rely exclusively on Dr. Lacey's conclusions about his ability to drive safely. Instead, Timmons contends that he should have been given a road test, which he considers a more reliable gauge of his ability to drive.

The undisputed evidence establishes that GM had legitimate concerns about Timmons's ability to drive safely. It had received reports about Timmons driving too slowly on the highways (indeed, one of Timmons's supervisors claims to have seen it himself). Timmons also reportedly asked his assistant to drive him to a meeting in Iowa because he was uncomfortable driving, and he crashed his scooter in a parking lot (although this accident may be attributable to a pothole). Timmons does not contend GM did not actually have these concerns or that they were not legitimately job related. GM, not inappropriately, asked to see Timmons's medical records to confirm his fitness for a job that requires a significant amount of driving. When Timmons ultimately refused to allow GM to see the records, GM asked him to submit to an examination—it certainly had good reason to do so. Dr. Lacey observed a variety of physical impairments and concluded Timmons should not be driving. GM was entitled to rely on a physician's recommendation that

Timmons could not safely drive a car; a road test, though one option, was not necessary.

Timmons tries to cast GM's decision as pretextual by pointing to Dr. Frank's summer 2002 and summer 2004 medical opinions that Timmons could drive. But GM never saw those opinions. Timmons kept GM from seeing his past medical records, and the statement from summer 2004 was made for purposes of this litigation, over fifteen months after GM made the decision to put Timmons on disability leave. GM had evidence only that Timmons's driving abilities may well be impaired and Dr. Lacey's conclusion that Timmons was indeed unfit to drive.

Timmons also argues that he had a clean driving record and a valid driver's license. But GM did not have to wait for Timmons to get a ticket or have an accident before it could evaluate his fitness to drive one of its vehicles. *Cf. Palmer v. Circuit Court of Cook County, Ill.*, 117 F.3d 351, 352 (7th Cir. 1997) (no requirement that employer retain employee who is likely to harm someone as a result of his disability because that would put "employer on a razor's edge—in jeopardy of violating the [ADA] if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone"). GM had evidence that Timmons's ability to drive may be deteriorating. His valid driver's license does not establish pretext; Timmons had not had a driving test for at least four years before Dr. Lacey examined him. Besides, GM is entitled to hold its drivers to stricter requirements than the State of Illinois. There is no evidence Dr. Lacey's medical exam was tainted or not objective.

Whether Timmons's evidence is considered under the direct or indirect method of proof, it is not enough to survive summary judgment. The undisputed evidence does not support an inference that GM discriminated against him because of his disability.

AFFIRMED.

No. 05-3258                                            15

A true Copy:

   Teste:


                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*