Mary SCHULTZ, Plaintiff,

v.

UNIVERSITY OF WISCONSIN HOSPITALS AND CLINICS AUTHORITY, Defendant.

No. 06–C–706–C.

United States District Court, W.D. Wisconsin.

Sept. 18, 2007.

Thomas R. Crone, Melli, Walker, Pease & Ruhly, S.C., Madison, WI, for Defendant.

## OPINION and ORDER

BARBARA B. CRABB, District Judge.

In this civil action for monetary relief, plaintiff Mary Schultz contends that she was passed over for a promotion by defendant University of Wisconsin Hospitals and Clinics Authority in violation of the Americans with Disabilities Act. 42 U.S.C. § 12101–12213. Plaintiff suffered from polio as a child, which caused her to lose almost all use of her legs. She moves about with the aid of crutches and a wheelchair. At times relevant to this lawsuit, plaintiff worked for defendant as a phlebotomist. When a "Phlebotomist–Senior" position became available, both plaintiff and a non-disabled co-worker applied for the job; plaintiff's co-worker received the promotion. Plaintiff asserts that defendant's proffered reason for its decision to promote her co-worker (that he gave better answers in his interview) is mere pre-

text and that the real reason she was not promoted was because of her disability.

Now before the court is defendant's motion for summary judgment. Defendant contends that plaintiff is not disabled within the meaning of the Americans with Disabilities Act because her ability to walk and move about has been restored significantly by her use of crutches. In addition, defendant contends that, even if a reasonable jury could conclude that plaintiff is disabled, it could not conclude that defendant's reason for promoting plaintiff's coworker was pretext for prohibited discrimination.

Defendant's motion will be denied. A reasonable jury could find that plaintiff was disabled within the meaning of the Americans with Disabilities Act. In addition, a reasonable jury could find that defendant's stated reason for hiring another candidate for the Phlebotomist–Senior position is pretextual.

Before setting forth the undisputed facts, I note that defendant has objected to many of plaintiff's facts that are supported by the affidavit of her family physician, Dr. William Heifner. Defendant's objections to these facts fall into two categories. First, defendant contends that Dr. Heifner's assessment of plaintiff's physical condition is ambiguous as to time. In many cases this information would be critical, plaintiff suffered from a degenerative disease. However, in this case, plaintiff sustained the relevant changes in her physical abilities when she had polio as a child and the parties do not legitimately dispute her abilities at the time she worked for defendant. Defendant points out that plaintiff has had two pregnancies since she was interviewed for the promotion, but offers no medical evidence that this would have altered her ability to move around. Therefore, I find that Dr. Heifner's assessments are sufficient to establish plaintiff's abilities at the relevant time.

Next, defendant argues that Dr. Heifner, a family practitioner in Oregon, Wisconsin, lacks foundation to express opinions comparing plaintiff's abilities to move about using crutches safely to others' abilities. This is a non-starter. As a family physician who has practiced medicine for almost 20 years, Dr. Heifner is qualified to provide his opinion about a patient's ability to move about using crutches relative to others he has treated in the course of his practice. Had Dr. Heifner been called on to provide an opinion about the expected effects of an obscure tropical disease on members of different populations, additional background information would be necessary to establish foundation. But this is not such a case.

From the parties' proposed findings of fact, I find the following facts to be material and undisputed.

## FACTS

### A.  *Plaintiff's Medical Condition*

Plaintiff Mary Schultz had polio as child. As a result of the polio, plaintiff has complete muscle atrophy in her legs. This condition is permanent. Plaintiff's legs have little or no ability to bear weight and she is able to stand and ambulate only when aided by crutches, a scooter or wheelchair. When plaintiff uses crutches to move about, she relies completely on her upper body strength because she cannot use her legs to support any of her body weight.

Plaintiff's family physician, Dr. Heifner, has practiced medicine since 1988. His office is in Oregon, Wisconsin and he has treated plaintiff for the past several years. Compared to other people who Dr. Heifner has treated who use crutches, plaintiff is significantly impaired. She can move a much shorter distance and faces a much greater risk of falling because she is com-

pletely dependant on her upper body strength. Because of the risks associated with her use of crutches, Dr. Heifner has advised plaintiff to use a scooter whenever possible.

### B. *Plaintiff's Prior Employment*

While plaintiff was in high school, she worked on the sales floor at a department store. During the school year, she worked evening shifts that were four hours long and weekend shifts that were eight or more hours. At plaintiff's request, the store made a stool available to her for times when she was not moving about the sales floor.

After high school, plaintiff worked full-time at a day care center, where she worked with children who were between the ages of five and ten. She took the children on after-school field trips and to parks, where she moved around with them. Plaintiff did not request any accommodations at the day-care center.

Following her job at the day care center, plaintiff attended technical college while working full-time for a group called REM Wisconsin. In this position, she provided services for developmentally disabled individuals, including assisting them with basic living, shopping, medical and social activities. Plaintiff held this position for two and a half years, moving from day-to-day care to a live-in care. When she performed live-in care, plaintiff lived in the same duplex as her patient and had no special accommodations. Plaintiff was required to drive a car, which she did, using hand-controls.

### C. *Plaintiff's Employment History with Defendant*

Plaintiff began her employment with defendant University of Wisconsin Hospitals and Clinics Authority on May 17, 1999. Her first position was as a "Phlebotomist–Associate." A phlebotomist's duties include drawing blood samples. Good phlebotomists must have good communication skills and the ability to insert a needle into any vein.

Defendant recognizes three classifications for phlebotomists: "Phlebotomist–Associate," "Phlebotomist–Objective" and "Phlebotomist–Senior." The "Phlebotomist–Associate" position is an entry-level position. The "Phlebotomist–Objective" position is obtained by reclassification based on technical proficiencies, but there is no bidding or promotional process involved. The "Phlebotomist–Objective" position requires more advanced skills, including inserting IVs and drawing blood in more challenging circumstances, and some teaching and training of new employees and students. Advancement to the "Phlebotomist–Senior" position requires a promotion, which employees may receive after competing in a pre-qualification and interview process.

Before plaintiff was hired as a "Phlebotomist–Associate," she was interviewed by Christine Sandoval, defendant's Phlebotomy Supervisor. During that interview, plaintiff told Sandoval that she had polio as a child. Sandoval knew that plaintiff required crutches to walk and that she used a wheelchair in certain circumstances. Sandoval made the decision to hire plaintiff and was her direct supervisor at all times relevant to this case.

In May or June 2000, plaintiff was reclassified to a "Phlebotomist–Objective" position. Sandoval submitted the paperwork that resulted in plaintiff's reclassification to this higher-rated position. The reclassification itself was made by defendant's Human Resources department.

### D. *Selection Process for Phlebotomist–Senior Position*

#### 1. *Application process*

In late spring of 2004, a "Phlebotomist–Senior" position became available. This position required more teaching and train-

ing than the lower-level phlebotomist positions. It also required documentation of training, reassignment of duties to other phlebotomists to avoid scheduling conflicts and on-call duties. Plaintiff believed that the PhlebotomistSenior position would require less walking than the Phlebotomist–Objective position.

The only two candidates who applied for the open Phlebotomist–Senior position were plaintiff and Dennis Foster. Foster had been hired by Sandoval as a Phlebotomist–Associate in June, 2003. Sandoval was very familiar with Foster's skills and work performance and had recommended his reclassification to a Phlebotomist–Objective position in January 2004. Foster had slightly more than one and a half years of experience as a phlebotomist before he began working for defendant; he had no prior experience training other phlebotomists. Foster does not use assistive devices to help him walk at work. In her recommendation to reclassify Foster in January 2004, Sandoval wrote that

> Dennis covers our In patient rounds, Out Patients, Comprehensive Cancer Center Lab, Blood Culture Draws. Dennis is proficient in drawing all ages of patients as well as draws from central venous catheters and inserts peripheral IV lines. Dennis is well respected among the clinical staff as well as his coworkers and supervisors. Advanced phlebotomy collections can be complicated and requires Dennis to have good problem solving skills and interact effectively with the clinical staff for clarification. Dennis was hired on 06/09/03. He has had 3 years prior phlebotomy skills allowing him to advance quickly.

In order to be considered for promotion to a senior position, job candidates who already work for defendant are required to submit a new application to the human resources department. The human resources department reviews the application, identifies the candidate's qualifications and experience related to the position for which he or she is applying and certifies whether the candidate is qualified to be interviewed. If a candidate is deemed qualified by the human resources department, the supervisor does not determine independently whether the candidate meets the minimum qualifications for the position. There is no requirement that seniority, length or service or overall experience as a phlebotomist be considered in selecting between candidates who meet the qualification requirements for a senior position.

## 2. *Interview process*

The human resources department determined that both plaintiff and Foster met the minimum qualifications for the Phlebotomist–Senior position. Therefore, both plaintiff and Foster received interviews for the position. The interviews were conducted jointly by Sandoval and Croft. They were familiar with both candidates and their previous work and considered both to be good phlebotomists.

Sandoval and Croft asked two sets of prepared questions during their interviews of plaintiff and Foster. The first set of questions read as follows:

1. In your opinion, please describe three characteristics of a good lead worker and how you see yourself fulfilling those characteristics?

2. Who are the customers of the laboratory and how would you encourage and promote greater customer service among the laboratory staff?

3. A clinical nurse manager calls from your liaison clinical unit with a complaint regarding one of the Phlebotomy staff. The CNM complains that this individual staff member is "always rude and inconsiderate with patients." How would you proceed with the complaint?

4. Everyone experiences stress in our fast-paced health care environment, please describe a stressful experience involving a patient? How did the situation arise? What steps did you initiate to manage the situation? Did you initiate any changes to ensure that this situation does not reoccur?

5. What is your definition of "Team Work"? How do you propose to foster a team environment?

6. A clinic or inpatient unit has a Clinical Nurse Assistant who is also a skilled Phlebotomist. They would like to train this person to collect specimens. What topics would you cover with this staff person? What tools or documentation would you use?

7. Do you have any questions for the interview panel or would you like to add any information about yourself that we did not cover?

8. What causes errors? What can we do to reduce this? (This question was handwritten on Sandoval's interview forms as question 7 and Croft's as question 8.)

The second set of questions read as follows:

1. Please describe your laboratory experience, education and training as it relates to the Lead Phlebotomist position?

2. Please describe a recent patient problems that you encountered and the steps you initiated to resolve it?

3. Currently, You are working as a phlebotomist among peers, if this Lead Worker position were offered to you, How do you see your role changing? Can you please indicate a potential problem issue and how you anticipate to resolve it?

4. You have had a chance to read the job description, are there any issues you would like to discuss at this time or additional comments that you would like to make?

Foster and Sandoval individually recorded the interviewees' responses to these questions. Sandoval recorded plaintiff's oral responses to the first and second sets of questions as follows:

1. Patient, be on the floors [with patients] [1]—[doctors] barging. Listens, slow down—keep cool, "depends on my mood"—"of the day." Follow through. I do all of these things. I'm not lacking in areas.

2. Anyone is, [patients, doctors, nurses]—other clinics. Be professional, polite, not snippy, clarifying.

3. Apologize to clinical nurse manager—confront staff manager, get both sides.

4. Patient relation, whistle blower, had [an isolation patient], family member attacked me at unit, escalating incident, cried in front of people—depersonalized it—talked to RN staff—clarify.

5. Working alongside co-workers, don't be too prideful to ask for help. I approach them and ask if they need help—stay [within] eyesight, looking at all areas to help out.

6. Equipment—order of draw—different sites—checklist—[specific] requirements—watch videos specific.

7. No—I've been here for a while—ready for responsibility—more change—more active—OK.

8. Working too fast—not paying attention. Be persistent. Be observant. Be

---

**1.** The brackets were included in defendant's proposed facts. Plaintiff did not dispute that these facts reflect what Sandoval and Croft wrote.

diligent. Slow down. Pay attention. AKA: [patient] discrepancy.

\* \* \* \* \* \*

1. [Phlebotomy] class at MATC—[observation] rotations—training five 5 years ago—learned [advanced] technique exposure—[order entry]—computer here—CPR training.

2. Last night—M—sick—Laura drew peds kid—assumed status quo—Core missing HIV consent form, called for Mary, got Laura—reminded verification of consent—Laura not remember bringing consent form. Core decided to spin and save the sample.

3. Not much. I'm still going to work alongside—taking on more initiative, problem solve. The title in itself—they get offended—"it'll be hard." I don't want to offend them.

4. It is generalized.

Croft also recorded plaintiff's answers to the first and second set of questions. His notes regarding her responses are as follows:

1. Feels she has those qualities. Patient—on the floor with patients, Dr.'s nurses, incompetent coworkers. No loose your cool. Listens—Follows through on things—come to Chris/Pat to see what next!

2. Anyone who comes to the outpatient lab, patients, doctors, nurses, PA's, etc. Being professional and polite, talking on the phone.

3. Apologize for this, will talk to that employee about this! Come down and talk to us.

4. Patient who was in [Isolation], nursing said was difficult, patient's daughter yelled at her, personally attacking her—let them vent—talked to the nursing staff—explained to [the] supervisor. Ask at nursing station for heads-up on any patient when first going to that unit!

5. Working along with coworkers—don't be prideful to ask for help! Go and ask if they need help, helping at the window or stocking to help where needed.

6. [Standard] equipment, order of draw, check-off list—show what other sites they could use! See what training they have had before. Protocol and channels before even being given.

7. Kind of ready for more responsibility! More active! Not in school—just working!

8. Double check, triple check. Being too fast—not paying attention. Consistent. Being diligent, not in a rush!

\* \* \* \* \* \*

1. Phleb class at MATC, rotations and has been here most of the time since. (five years ago) Learned her OE and computer staff here, annual training, etc. Familiar with the lab QA variance report form.

2. Just last night, clinic from upstairs at U station said missing HIV consent form. (Laura drew earlier.) Core said they were going to throw the blood away! Called Laura, asked about consent form. Laura did not remember.

3. Does not see much of a change—work as usual—Taking more responsibility and initiative in problem-solving—delegating—understanding the skill mix—Knows the staff and what their skills are.—Staff get offended by asking staff to some things, and they look at you as if you are throwing their weight around—Take, ask and tell them they have the expertise to go!

4. Not really. Depending on the Shift. OK with the PD!

Sandoval recorded Foster's responses as follows:

1. Professional—Loves doing Phlebotomy—want to do management some day, very rewarding task for him—do everything to please the customer. Outgoing. Customer service.

2. [Patients], Fellow coworkers, [Supervisors]. Through example—[especially] when eyes are on him—showing to work daily attendance—follow [policy and procedure].

3. Go straight to the [phlebotomist]—something needs to change. Do you realize that your impression gave employee benefit of the doubt—go to [the] manager.

4. Incident [with patient] for [blood cultures]—[patient] refused—[doctors] approached [patient], encourage the draw—given poor diagnosis in front of a [phlebotomist]—talked [patient] into it—lots of tears from the spouse—finds and uses resources (wisely).

5. Work together and accomplish goals, getting things done—not be afraid to ask for help—take initiative that [patient's] safety is met properly—let coworkers know you're here for them.

6. Ask permission with management—go through [venipuncture capillaries] equipment, include butterflies, order draw, discuss minimums, get help if you need a hold, syringe draws, access devices, flushing guidelines with waste—running IV's.

7. Not really, just maybe one comment—If I'm given the opportunity to promote, I'll do the very best job I can do. If not, I will remain the professional blood drawer I feel I am.

8. Don't take time to read all labels. Have it within themselves to correct errors—Training. Repetition. Help them come up with troubleshooting. Treat them like a student—retraining.

\*　　\*　　\*　　\*　　\*　　\*

1. Started three years ago—July of 2000, CNA license, American Swedes, [patient care techniques], venipuncture, St. Anthony, in 2001—ABG's—[order entry]—capillary draws—see training manual from UWHC.

2. Had a patient come for [fasting glucose]—vomited—called core—techs called the clinic—canceled it—[I] added—clinic sending a green sheet—remind [patient] to do a [urine]—make sure IV is pulled when returns for the [urine].

3. See myself gaining respect of peers and of management. Going to make decisions that are not popular from time to time but feels he has a good rapport with staff and it's flow you ask and tell and your tone, how you say it. Also that distribute change fairly, not always ask the same person. If ends up being challenged, why are you picking on me? I'll tell them Im' not picking on them—merely trust they can do what's being asked of them.

4. Parking if 8 to 5 job would be a challenge as always, would find a spot by the cemetery again.

Croft recorded Foster's responses as follows:

1. Professional, outgoing, customer service. Tries to promote best customer service. Professional—[ ]doing phlebotomy—may look at going to school for nursing, but enjoys doing phlebotomy!

2. Patient, coworkers, supervisors. Provide a good example—customer friendly—come to work every day and call in if not there.

3. Go straight to that person and lay out the complaint to the [phlebotomist]. Then bring to Pat/Chris' attention. Get back to the unit. Thank you for letting me know.

4. Patient for blood cultures—patient refused because no veins. Doctor came in and talked to him, talked to the patient about what he was going to do and what the patient was okay with. Patient was just given a poor prognosis! Nurse knew ahead of time and Kim also, so

more communication to Denny and nursing to the patient might have helped!

5. Working to accomplish the good of taking care of the patient. Don't be afraid to ask for help! Letting your coworkers know that you're there to help them and their patients better!

6. Check with supervisor to see if okay first. Venipuncture and capillary draws, use of butterflies, order of draw, minimums, [hard draw], help hold. [ ] versus vacutainers. Different accesses, flush and when not to flush, drawing waste—[phlebotomy] training manual, [policy and procedure] review. Specimen handling.

7. Try to do the best possible job you can do.

8. Labels mistakes, not taking the time to read the labels—habit within themselves—training—tell them over and over! help them—talk to the employee again.

\*　　\*　　\*　　\*　　\*　　\*

1. Three years ago, 7–2–04—CAN—started at Swedish American, EKGs. Monitors, patient care tech. Then St. Anthony's, arterial blood gases, venipuncture, capillary draws.

2. Patient with two-hour FBS—throwup—called core—normally no—call the clinic, called optx to send patient back for UA. Be sure to remove the IV.

3. More responsibility and respect, be a better example and role model. Talked about a doctor's son and drawing this patient's blood and the problems associated with entering these Waisman tests. Feels has good relationship with staff to ask them what to do. We're short right now, so you need to do this. It's how you say it also!

4. If you get this position, try his best to do a great job as he has as a phlebotomist.1998—temp supervisor in a factory!

3. *Outcome*

Sandoval and Croft decided that Foster should receive the promotion to the "Phlebotomist–Senior" position. They did not rely on information in plaintiff's or Foster's applications for the position, résumés or evaluations in deciding whom to promote. Sandoval and Croft believed they had enough day-to-day experience with plaintiff and Foster to evaluate their skills.

OPINION

Plaintiff contends that defendant violated the Americans with Disabilities Act by deciding not to promote her because of a disability. The Americans with Disabilities Act, 42 U.S.C. § 12112(a), provides

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

█ A plaintiff seeking to avoid summary judgment on a claim under the Americans with Disabilities Act "must demonstrate that there is at least a genuine issue of material fact as to whether he is disabled, whether he can perform the essential functions of the position, and whether he has suffered an adverse employment action because of his disability." *Kupstas v. City of Greenwood,* 398 F.3d 609, 611 (7th Cir.2005). A plaintiff may show a causal link in two ways: either by (1) showing directly that the defendant discriminated against her because of her disability, or (2) establishing illegal motive indirectly through the three-step model of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Conley v. Village of Bedford Park,* 215 F.3d 703, 711 (7th Cir.2000).

Plaintiff is pursuing the indirect method of proof in this case. In the context of a claim brought under the Americans with Disabilities Act for failure to promote, this method requires a plaintiff to adduce evidence that (1) she was disabled within the meaning of the Americans with Disabilities Act; (2) she applied for and was qualified for the position sought; (3) she was rejected for the position; and (4) the candidate promoted had similar or lesser qualifications for the job. *Id.* If plaintiff can adduce sufficient evidence regarding each these elements, the burden shifts to defendant to identify a legitimate, non-discriminatory reason for it's decision. *Timmons v. GMC,* 469 F.3d 1122, 1128 (7th Cir.2006). If defendant meets this burden, the burden again shifts to plaintiff to adduce evidence that the stated reason for the decision is pretext for discrimination. *Id.*

Defendant has moved for summary judgment on two alternative grounds, which I will consider in turn. First, defendant contends that plaintiff is not disabled within the meaning of the Americans with Disabilities Act. Second, it contends that plaintiff has not adduced evidence that defendant's proffered reason for promoting Foster instead of plaintiff was pretext for discrimination.

### A. Whether Plaintiff is "Disabled" under the Americans with Disabilities Act

The Americans with Disabilities Act defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [the] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff contends that she has a disability under subsection (A). A plaintiff is disabled under the Americans with Disabilities Act when her impairment "substantially limits" her in any major life

activity. *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). The Supreme Court has recognized that walking is a major life activity. *Id.* at 197, 122 S.Ct. 681.

Whether a particular impairment "substantially limits" a major life activity is a "case-specific, individualized assessment," *Kampmier v. Emeritus Corp.,* 472 F.3d 930, 938 (7th Cir.2007), but the Court of Appeals for the Seventh Circuit has provided some guidance about what constitutes a disability with respect to walking. "To be disabled with regard to the major life activity of walking, the employee must be 'substantially limited' in her ability to walk, and the limitation must be permanent or long term, and considerable compared to the walking most people do in their daily lives." *EEOC v. Sears, Roebuck & Co.,* 417 F.3d 789, 802 (7th Cir. 2005). There is no question that plaintiff is substantially limited in her ability to walk when she is not using crutches or another assistive device. The more complicated matter is whether she is substantially limited in her ability to walk when she does use such aids.

In *Sutton v. United Air Lines,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the United States Supreme Court held that it is necessary to evaluate whether a plaintiff is substantially limited in her ability to engage in a major life activity when using corrective aids or devices. *Id.* at 483, 119 S.Ct. 2139 (holding that plaintiffs with severe myopia were not disabled when their vision was not impaired when using corrective lenses). In this case, plaintiff attempted to compensate for her limited ability to walk by using crutches, a wheelchair and a scooter to move about. Defendant asserts that plaintiff is so skilled in using these assistive devices that

her ability to "walk" is not substantially impaired.

At first blush, this is an appealing argument, as it is clear that plaintiff has adjusted effectively to her inability to use her legs to move about. Using a combination of crutches and a wheelchair, plaintiff is able to do many of the same things as individuals who have full use of their legs. As defendant points out, plaintiff has had several jobs that required her to move about easily and she was able to do them with little or no accommodation.

■ However, to suggest that a person who is unable to use her legs to bear any of her body weight is not substantially limited in her ability to "walk" stretches the notion of "walking" too far. *See, e.g., New Oxford American Dictionary,* 1898 (2001) (defining "walk" as "to move at a regular and fairly slow pace by lifting and setting down each foot in turn, never having both feet off the ground at once"); *Webster's New World Dictionary* 1608 (3d College ed.1998) ("walk" defined as "to go along or move about on foot at a moderate pace; to move by placing one foot firmly before lifting the other, as two-legged creatures do"). Although plaintiff's crutches allow her to move about in an upright position and function in a similar manner as if she were moving about using her feet, the fact remains that she relies upon her upper body strength alone to do so. Given plaintiff's inability to support any of her body weight with her legs and complete reliance on upper body strength for ambulation, plaintiff's use of her crutches no more allows her to "walk" in a traditional sense than her use of a wheelchair does. As the Supreme Court noted in *Sutton,* "Individuals who use prosthetic limbs or wheelchairs may be mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to walk or run." 527 U.S. at 488, 119 S.Ct. 2139.

Moreover, plaintiff's doctor has averred that, even when using her crutches, plaintiff is substantially limited in her ability to move about because she must rely entirely on her upper body strength for propulsion. As a result, she is able to travel no more than a half-mile on her crutches and faces a greater risk of falling than other users of crutches (and presumably a much greater risk of falling than a person not using crutches at all). Defendant asserts that these limitations are insufficient to demonstrate that plaintiff is substantially limited in her ability to walk. In support of this argument, defendant cites two unpublished cases. To the extent that either is persuasive, both are distinguishable. In *Rutherford v. Wackenhut Corp.,* 2006 WL 1085124 (E.D.Wis. April 26, 2006), the district court found that a plaintiff who could not walk more than half a city block *without* her cane was not substantially limited in her ability to walk, when she had adduced no evidence about her ability to walk with her cane. In *Goodman v. St. Joseph Mercy Oakland,* 2007 WL 522702, 2007 U.S. Dist. LEXIS 10060 (E.D.Mich. Fed.14, 2007), the district court held that a plaintiff who used one or two crutches to move about because one of her knees was injured badly in a car accident was not substantially limited in her ability to walk. However, in both cases the plaintiffs had failed to adduce any evidence that their ability to walk was impaired when using a cane or crutches and it appeared that they were able to perform many other life activities without limitation.

■ More on point is the decision of the Court of Appeals for the Seventh Circuit in *Sears, Roebuck & Co.,* 417 F.3d at 802, in which the appeals court held that a reasonable jury could conclude that the plaintiff was substantially limited in her ability to walk after she developed neuropathy in one leg that made it difficult for

her to walk more than a city block. *Id.* at 793. Although the plaintiff in this case is able to travel a slightly longer distance when using her crutches than the plaintiff in *Sears, Roebuck & Co.* was able to travel comfortably using a cane, I cannot conclude that this difference is dispositive as a matter of law. A reasonable jury could conclude that plaintiff was substantially limited in her ability to walk, even when she was using crutches or a wheelchair.

### B. *Pretext*

Next, I must consider defendant's argument that it is entitled to summary judgment because plaintiff has failed to adduce evidence from which a reasonable jury could conclude that its reasons for promoting Foster and not plaintiff were pretextual. Sandoval and Croft have stated that they had no preconceived notions about who would be better for the position and that it was the quality of the candidates' interviews that led them to their decision about who to hire. They state that they believed that Foster's answers were more complete, on point and enthusiastic than plaintiff's and that his answers demonstrated better leadership qualities. Plaintiff asserts that Sandoval and Croft recorded her answers incorrectly and that the answers she gave indicated more enthusiasm for the position as well as better leadership skills. She asserts as well that the first questions they asked in the interview related to her need for additional accommodations for her disability related to her new pregnancy. Neither Croft nor Sandoval recall whether they asked questions about plaintiff's need for additional accommodations. Plaintiff contends that the inaccurate recording of answers that were less positive than the ones she gave is evidence of pretext.

■ Pretext means more than just a decision made in error or in bad judgment; it means a lie or a phony reason for the action. *Wolf v. Buss (America), Inc.,* 77 F.3d 914, 919 (7th Cir.1996). The issue is not whether the employer's evaluation of the employee was correct but whether it was honestly believed. *Olsen v. Marshall & Ilsley Corp.,* 267 F.3d 597, 602 (7th Cir.2001). A plaintiff can prove pretext through direct evidence that shows that an employer is lying or through indirect evidence that shows that the employer's reasons are not factually supported, were not the real reason for the adverse action or were not sufficient to prompt the adverse action. *Ajayi v. Aramark Business Services, Inc.,* 336 F.3d 520, 534 (7th Cir. 2003); *Vukadinovich v. Board of School Trustees of North Newton School Corp.,* 278 F.3d 693, 699–700 (7th Cir.2002). In some cases, shifting explanations for a personnel decision create doubt about its legitimacy. *Culver v. Gorman,* 416 F.3d 540, 549 (7th Cir.2005) ("An inconsistent employer explanation may help to support a finding of pretext.").

Much of plaintiff's evidence regarding pretext is not probative, such as a form that incorrectly lists the date on which Foster assumed the Phlebotomist–Objective position. More on point is plaintiff's evidence that Sandoval and Croft misreported her interview answers to make them appear worse than they were. Because defendant's asserted reason for promoting Foster over plaintiff is that he gave better answers to the interview questions, any disputes regarding the answers plaintiff gave are highly relevant to the issue of pretext.

■ The Court of Appeals for the Seventh Circuit has followed the sensible rule that employers may use subjective criteria when making personnel decisions, such as an evaluation of which candidate gave better answers in an interview. *EEOC v. Target Corp.,* 460 F.3d 946, 957 (7th Cir. 2006). However, an employer's use of sub-

**1036**

jective criteria may leave it more vulnerable to a finding of discrimination. *Sattar v. Motorola, Inc.,* 138 F.3d 1164 (7th Cir. 1998). In this case, plaintiff has come forward with evidence that her answers were recorded inaccurately and in a manner less favorable to her.

Taking plaintiff's version of the facts as true, Sandoval recorded plaintiff's response to a question about characteristics of a good lead worker as including plaintiff's statement that her performance would vary "depending on my mood on the day." Plaintiff did not say that her performance would vary depending on her mood.

Next, Sandoval failed to record plaintiff's full response regarding her understanding of the term "teamwork." Plaintiff included in her answer a statement that "it was important to lead by example, that a leader has to do more than simply delegate tasks." Sandoval recorded plaintiff's answer as "working alongside coworkers, don't be too prideful to ask for help. I approach them and ask if they need help. Stay within eyesight, looking at all areas to help out."

Finally, plaintiff was asked "Currently you are working as a phlebotomist among peers. If this Lead Worker position were offered to you, how do you see your role changing? Can you please indicate a potential problem issue and how you would resolve it?" Croft recorded plaintiff's answer as

> Does not see much of a change—work as usual—Taking more responsibility and initiative in problem-solving—delegating—understanding the skill mix— Knows the staff and what their skills are.—Staff get offended by asking staff to some things, and they look at you as if you are throwing their weight around—Take, ask and tell them they have the expertise to go!

Sandoval recorded plaintiff's response as follows "Not much. I'm still going to work alongside—taking on more initiative, problem solve. The title in itself—they get offended—"it'll be hard. "I don't want to offend them." However, according to plaintiff, she did not say that she thought it would be hard to take on a new position. Instead, she said that she knew the skill mix among staff and that she could help them "live up to his or her potential." In addition, she said that, although she would not want to offend anyone, she realized that it might be a consequence of telling people what to do.

■ Overall, Sandoval and Croft's notes consistently report plaintiff's responses as somewhat diffident and lacking in desire or understanding about taking on additional responsibilities. The answers plaintiff says she gave reflect more enthusiasm and initiative. A reasonable jury could conclude that these consistent alterations making plaintiff's answers appear less appealing are evidence of pretext. Perhaps a jury will find that plaintiff's recollection of the precise wording of her answers is not credible several years after the fact. But this kind of credibility assessment is made properly by a jury, and not the court at summary judgment.

■ Finally, defendant correctly notes that mistakes are not evidence of pretext. *Merillat v. Metal Spinners, Inc.,* 470 F.3d 685, 693 (7th Cir.2006). Perhaps the inconsistencies plaintiff asserts occurred between her actual answers and the answers recorded by Sandoval and Croft were simply errors in note taking. In that case, plaintiff could not prevail ultimately on her claim. However, I cannot conclude as a matter of law that inaccurate note taking is the reason for the discrepancies. Although a jury might agree with this argument, the discrepancies are significant

enough that a jury could find reasonably that they were intentional.

### ORDER

IT IS ORDERED that the motion for summary judgment of defendant University of Wisconsin Hospitals and Clinics Authority on plaintiff Mary Schultz's claim of discrimination under the Americans with Disabilities Act is DENIED.